UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Heidi L. Stertz,

                Plaintiff,

      vs.                       REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

                Defendant.       Civ. No. 05-2960 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which partially denied her application for Disability

Insurance Benefits ("DIB").  The matter is now before the Court upon the parties'

cross-Motions for Summary Judgment.  The Plaintiff has appeared by Edward C.

Olson, Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United

States Attorney.  For reasons which follow, we recommend that the Defendant's

Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

II. Procedural History

The Plaintiff first applied for DIB on April 2, 2003, [T. 19, 70-74], at which time, she alleged that he had become disabled on February 4, 2002. [T. 71, 96]. She was insured for DIB through December 31, 2008. [T. 19]. The State Agency denied the Plaintiff's claims upon initial review, [T. 39-43], and upon reconsideration. [T. 46-48]. The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on December 1, 2004, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by an attorney. [T. 19, 411]. Thereafter, on April 19, 2005, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 19-32]. On June 15, 2005, the Plaintiff requested an Administrative Review before the Appeals Council, and submitted additional evidence for the Council's review. [T. 12-15]. The Appeals Council denied the Plaintiff's claim for review on October 2, 2005. [T. 8-10]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

III.  Administrative Record

A.     Factual Background.  The Plaintiff was twenty-nine (29) years old when she claimed she became disabled, and thirty-three (33) years old when the ALJ issued her decision.  [T. 71-72].  She was right-handed, a college graduate, and had past significant work as an internal auditor for a mortgage bank, a part-time bank teller, a food server/dishwasher, and a grocery store cashier. [T. 97, 102, 108, 412-13].

1.     Medical Records Submitted Prior to the Hearing.  The medical record reveals that the Plaintiff saw chiropractor Dr. Paul J. Zilka for complaints of neck and back pain from February of 2002, until April of 2002.  [T. 139-53].  An undated office note reflects that the Plaintiff's condition improved after her work station was upgraded with a new desk and footrest, and that she also experienced improvements in her condition from her chiropractic care.  [T. 148].

On March 27, 2002, the Plaintiff was examined at the Minneapolis Clinic of Neurology by Dr. Crispin See for complaints of headache and neck pain, and Dr. See found that "there is no specific injury to [the Plaintiff's] head or neck." [T. 165].  An examination of the Plaintiff at that time revealed normal muscle tone and strength in all extremities.  [T. 164].  Dr. See also found that the Plaintiff retained full ranges of motion in her back and neck, and had normal motor and sensory function,

- 3 -

coordination, deep tendon reflexes, gait and station.  Id.  Dr. See prescribed Flexeril,[1] and Naprosyn.[2]  [T. 163-64].  In April of 2002, the Plaintiff also underwent an MRI of her brain and cervical spine.  [T. 161-62].  While the brain MRI was normal, the cervical MRI revealed degenerative changes, but no bulging discs or impingement of nerve roots.  [T. 162].  After reviewing the MRIs, Dr. See re-examined the Plaintiff, and noted normal neurological findings with only mild muscle tenderness, and no spasm.  [T. 163].

In April of 2002, Dr. Zilka completed a "workability form" for the Plaintiff's employer, in which he opined that the Plaintiff could work with the following limitations:  keyboarding, writing, repetitive writing motion, work with outstretched arms, reach above her shoulders, bend and twist one (1) to three (3) hours per day; sitting and rotating positions four (4) to six (6) hours per day; and grasping, pinching squatting, kneeling, standing and walking seven (7) to eight (8) hours per day.  [T.

---

[1]Flexeril "is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Physician's Desk Reference, p. 1833 (60th ed. 2006).

[2]Naprosyn is a "non-steroidal anti-inflammatory," that is used for the treatment of rheumatoid arthritis, osteoarthritis, juvenile arthritis, ankylosing spondylitis, tendonitis and bursitis, and acute gout.  Physician's Desk Reference, p. 2769 (60th ed. 2006).

139, 262].  Dr. Zilka concluded that the Plaintiff could not climb or lift and carry more than ten (10) pounds.  Id.  Dr. John S. Jacoby also completed a "workability form" for the Plaintiff in April of 2002, in which he stated that the Plaintiff could squat, kneel, stand or walk, bend or twist, and rotate no more than one (1) to three (3) hours per day, sit for four (4) to six (6) hours per day, and could not reach above her shoulder or climb.  [T. 261].

The Plaintiff was evaluated at the Noran Neurological Clinic on May 14, 2002. [T. 207-09].  The attending physician noted muscle tenderness, although he also found that the Plaintiff retained a full range of motion of her spine.  [T. 208].  On May 15, 2002, the Plaintiff presented to the Emergency Room at Fairview Southdale Hospital complaining of increased neck pain. [T. 154-55].  An examination revealed no muscle spasm, and found that the Plaintiff had a full range of motion in her neck, and normal strength, reflexes, and sensation, in all extremities.  Id.  The Plaintiff stated that the only medications that she was taking were Tylenol with codeine, and Ambien[3] for sleep.  [T. 154].  An x-ray of the Plaintiff's cervical spine, taken on May 20, 2002, also revealed no abnormalities.  [T. 206].  However, the Plaintiff again presented to

---

[3]Ambien "is indicated for the short-term treatment of insomnia."  Physician's Desk Reference, p. 2868 (60th ed. 2006).

the Emergency Room on May 22, 2002, complaining of neck pain. [T. 156-57]. The attending physician noted that he could "see no significant cause for her pain on examination," and recommended that the Plaintiff see just one physician in the future who could concentrate on locating the source of her pain. [T. 157].

From May of 2002, until January of 2003, the Plaintiff saw Dr. Ronald M. Tarrel for complaints of neck pain and headaches. [T. 194-209]. Dr. Tarrel generally observed that the Plaintiff's strength, gait, and reflexes were normal. [T. 196-97, 204, 208]. The range of motion in the Plaintiff's spine was also normal, but Dr. Tarrel palpitated trigger points throughout the lumbar, thoracic, and cervical regions. [T. 208]. An x-ray of the Plaintiff's cervical spine, which was taken in May of 2002, was normal. [T. 206]. In May of 2002, Dr. Tarrel completed a "Report of Work Ability," in which he stated that the Plaintiff was limited to working two (2) hours per day, five (5) days per week, through June 10, 2002, and that she could lift five (5) to ten (10) pounds. [T. 259]. He limited all postural and manipulative activity, sitting, standing, and walking, to no more than three (3) hours per day during the same period. [T. 260].

On July 24, 2002, the Plaintiff was again examined at the Minneapolis Clinic of Neurology, this time by Dr. Yelena V.Usmanova. [T. 159-60]. Dr. Usmanova

noted that the Plaintiff attributed her neck and shoulder pain to a work-related injury, and also that the Plaintiff "seems to be very concerned about her symptoms." [T. 159-60]. An examination revealed normal neurological findings. [T. 160]. Dr. Usmanova wrote in her notes that she was not sure of the exact etiology of the Plaintiff's symptoms, and that she offered to perform an electromyogram ("EMG"), but that the Plaintiff declined. Id.

On September 19, 2002, the Plaintiff underwent a lumbar MRI, with unremarkable findings. [T. 166]. Treatment notes from the staff at the Edina Medical Pain Clinic from September of 2002, until June of 2003, generally showed normal deep tendon reflexes, strength, and sensory function. [T. 226-46]. The Plaintiff had full ranges of motion in her lumbar and cervical spine. [T. 244]. The Plaintiff also reported that she was doing well emotionally, and denied either depression or anxiety. [T. 245].

By November of 2002, the Plaintiff completed a course of physical therapy. [T. 167]. The physical therapist noted that the Plaintiff's response to therapy "has been far more 'fragile' than is typically seen, as she exhibits full mobility in terms of spinal [active range of motion]," but continued to exhibit ongoing symptoms. [T. 168]. The physical therapist also observed that the Plaintiff's complaints regarding her

functional status varied over the course of treatment, with the Plaintiff noting no trouble going camping one weekend, and being able to load a dishwasher in October of 2002. [T. 167].

In January of 2003, Dr. Tarrel recorded that the Plaintiff "exhibits a great deal of illness behavior and chronic pain behavior," and suggested that she was "in the midst of chronic pain syndrome." [T. 194]. Dr. Tarrel further observed that the Plaintiff did "not have any evidence of neurologic illness of any kind," [T. 184], and "strongly encouraged" the Plaintiff "to give up looking for more specific diagnoses or more specific treatments that will correct her without effort on her own." [T. 194].

The Plaintiff was seen by chiropractor Dr. Michael R. Zuckman at the Bloomington Lake Clinic, from January of 2003, until November of 2004. [T. 247-65]. The physical examinations of the Plaintiff at that Clinic found predominantly normal muscle strength, ranges of motion, deep tendon reflexes, and sensory function. [T. 248-50, 256-58].

In April of 2003, the Plaintiff was discharged from the physical therapy program at the Edina Clinic, because she stopped attending physical therapy sessions. [T. 239-40]. Also in April of 2003, Dr. Gregory Lamberty examined the Plaintiff, on the referral of Dr. Tarrel. [T. 306-10]. Dr. Lamberty noted that the Plaintiff was

"mildly anxious" throughout the interview.  [T. 307].  Cognitive testing indicated average intellectual functioning and academic achievement, and the Plaintiff demonstrated basic attention and concentration abilities within an acceptable range. [T. 308]. Dr. Lamberty administered the Minnesota Multiphasic Personality Inventory ("MMPI"), and the Plaintiff's test results were within normal limits, showing no acute or long-term pyschopathology.  [T. 309].  Dr. Lamberty opined that the Plaintiff did not need further psychological or neurological assessments. Id.

In May of 2003, a State Agency medical consultant reviewed the medical evidence of record, and concluded that the Plaintiff retained the capacity to lift and carry fifty (50) pounds occasionally, and twenty-five (25) pounds frequently. [T. 218-25].  The State Agency medical consultant further concluded that the Plaintiff could sit and stand or walk about six (6) hours each, during an eight (8) hour work day, but should avoid frequent overhead work.  [T. 219, 221].

During an examination in July of 2003, Dr. Sunandra Apte-Kakade reported that the Plaintiff had normal posture and balance, no problems with tandem walking, rising on tiptoes, and heels, or balancing on one foot at a time. [T. 394].  The Plaintiff demonstrated normal strength, sensory function, and deep tendon reflexes ("DTR") in all four extremities.  [T. 395].  Dr. Apte-Kakade also noted that the Plaintiff had

normal range of motion in her cervical spine, and that her straight leg raising was negative. Id.

2.    Medical Records Submitted After the Hearing.   Following the Hearing, the Plaintiff submitted additional treatment notes from Dr. Zuckman dating from August of 2003, until November of 2004, [T. 316-360], as well as records from Body Works Physical Therapy from August of 2004, [T. 361-62], the Minneapolis Clinic of Neurology, [T. 363-64], Abbott Northwest Hospital, [T. 365-66], Physicians Diagnostics and Rehabilitation, [T. 367-95], and a physical work performance evaluation from February of 2004.   [T. 396-403].   The records were generally consistent with the Record as a whole.

The August and September of 2004 records from Dr. Zuckman disclosed that the Plaintiff complained of abnormal sensation in her right upper extremity, and that the Plaintiff's physician reported decreased strength in her thumb-to-fifth digit in her right hand. [T. 319-20]. However, the Plaintiff retained full grip strength. [T. 320]. An EMG of the Plaintiff's right upper extremity, which was taken in August of 2004, was within normal limits. [T. 364].

In February of 2004, the Plaintiff underwent a "Physical Work Performance Evaluation." [T. 396-403]. The evaluator concluded that the Plaintiff was capable of

performing sedentary work, noting that, "[g]iven the extent of self-limiting behavior, however, this overall level of performance [was] influenced by what the client was willing to do, rather than her maximum safe ability." [T. 396]. The evaluator noted that the Plaintiff participated fully in ten (10) out of eighteen (18) tasks, and "demonstrated self-limiting participation by stopping on 8 out of 18 tasks." Id. The evaluator also observed that the Plaintiff's muscle strength was within functional limits, that ranges of motion throughout her body were normal, and that the Plaintiff moved normally when walking to and from testing areas, but markedly slowed her pace in direct testing situations. [T. 397]. The evaluator stated that the Plaintiff failed three (3) or more of the validity criteria, and therefore, there was a "strong likelihood" that she was not complying with the test, and that the results were invalid. Id. The evaluator identified, as a factor underlying the Plaintiff's limitations, "psychosocial/motivational factors." Id. Ultimately, the evaluator recommended that the Plaintiff return to her work as a staff auditor. [T. 397-98].

Before the Appeals Council, the Plaintiff submitted the results of a Psychodiagnostic Evaluation, which was performed in March of 2005. by Dr. Paul M. Reitman, and that were not available to the ALJ. [T. 14, 404-08]. After evaluating the results of the Plaintiff's cognitive tests, Dr. Reitman found no significant

impairment in the Plaintiff's ability to engage in competitive employment, but expressed the view that she had a conversion disorder and was "work-resistant." [T. 407].

B.      Hearing Testimony.  The Hearing, on December 1, 2004, commenced with some opening remarks by the ALJ.  [T. 411].  The ALJ then asked the Plaintiff's attorney if he had any objections to any of the evidence being introduced into the Record, and counsel indicated that he did not.  Id.  The ALJ asked the Plaintiff's attorney if all of the relevant documents had been disclosed, and he replied that records from the Bloomington Lake Clinic relating to the Plaintiff's treatment by Dr. Zuckman, from August of 2003, until the date of the Hearing, had not yet been obtained.  Id.  The ALJ stated that she would leave the Record open for ten (10) days to receive those records.  [T. 412].  The Plaintiff's counsel had no further opening remarks, and the Plaintiff was sworn to testify.  Id.

The Plaintiff gave her full name and address, stated that she lived alone, and had a B.A. degree, with no further vocational training.  Id.  The ALJ then asked the Plaintiff why she felt that she could not work a full time job, and the Plaintiff replied that she had an injury that limited her ability to work.  Id.  The Plaintiff elaborated that she suffered from low back pain, and spinal pain, that limited her severely, making

sitting difficult, and also making walking a great distance painful.  [T. 412-13].  The Plaintiff also testified that she had shoulder and neck limitations, and that she was right-handed, but pain made it difficult to use her right arm and hand.  [T. 413].  The ALJ noted that the Plaintiff was in a wheelchair at the Hearing, and asked how long she had been using a wheelchair.  Id.  The Plaintiff replied that she had been using a wheelchair since 2002, but that it was not prescribed by a doctor, and she did not use the wheelchair in her home, as her doorways were not wide enough to accommodate it.  Id.  The ALJ then asked the Plaintiff about a cane that she was also using, and the Plaintiff clarified that it was a crutch, and that it had been prescribed by her physician. Id.  The Plaintiff stated that the crutch helped with her balance and stability, and that she used the crutch all of the time, even while at home. [T. 414].

Next, the ALJ asked the Plaintiff how long she could sit with some discomfort, but without excruciating pain.  Id.  The Plaintiff testified that the length of time varied, but usually she could stand ten (10) to twenty (20) minutes, although she could sit for longer if she just bore the pain.  Id.  The Plaintiff added that, if she was allowed to lean against something and use her crutch, she could stand for ten (10) or fifteen (15) minutes, and possibly a half an hour.  Id.  The ALJ asked the Plaintiff how far she could walk, if she were to use her crutch, and the Plaintiff replied that she was not

sure.  Id.  In response to the ALJ's inquiry, into how much weight she could lift, the Plaintiff testified that she could only lift a couple of pounds on most days.  Id.  The Plaintiff also testified that she did stretching exercises every day, three (3) to five (5) times a day, for her low back, as well as stretching and range of motion exercises for her shoulders and neck, and pool therapy a couple of times a week.  [T. 414-15].

Next, the ALJ asked the Plaintiff about her activities of daily living.  Id.  The Plaintiff testified that she did exercises before she got out of bed, and then performed her grooming, ate and watched television, and talked on the phone.  Id.  According to the Plaintiff, she was able to get up and go to appointments, have lunch, and perform chores around the house, such as picking up after herself or putting dishes in the sink for a homeworker to wash.  Id.  The ALJ asked how often the Plaintiff's homeworker came, and the Plaintiff replied that she came twice a week, and stayed for two (2) hours. [T. 415-16].

The ALJ asked the Plaintiff about her other activities of daily living, and the Plaintiff testified that she watched television, but that she had a difficult time reading, as she had trouble positioning her neck. [T. 416].  The Plaintiff testified that she owned a computer, but did not use it.  Id.  In response to the ALJ's question, regarding the frequency with which the Plaintiff left her house, she stated that, in addition to

doctor's appointments, she went to the grocery store, to pool therapy, to physical therapy, and to go out to eat with friends or to visit them in their homes.  Id.  The Plaintiff stated that she went to the mall, and also went to church twice a week, and belonged to a Bible study group.  [T. 416-17].  The ALJ asked the Plaintiff if she drove, and she replied that, while she owned a car, it was very difficult for her to drive, and that she was driven to her doctor's appointments, or took a transportation service. [T. 417].  The Plaintiff noted that she had last tried to drive three (3) weeks prior to the Hearing.  Id.

The ALJ then turned to the Plaintiff's physical impairments.  Id.  In response to the ALJ's question, the Plaintiff testified that her only physical problems were with her back, neck, and shoulder.  Id.  The Plaintiff stated that she had no side effects to her medications, although she acknowledged some insignificant "loopiness." Id.  The ALJ noted that the Plaintiff had attended a pain clinic in 2003, and asked the Plaintiff if she had attended one since that time.  Id.  The Plaintiff admitted that she had not. Id.  The ALJ asked the Plaintiff if she had worked at any time since February of 2002, and she admitted that she did work in the Fall of 2002, but was then granted long-term disability, and then, in May of 2003, she tried to return to work for two (2) hours a day, but was fired in March of 2004, because she could not work more hours.  [T. 417-

- 15 -

18].  The Plaintiff added that in April or May of 2004, she had placed her name in with an agency that located jobs for people with limitations, but that she had not heard anything from them.  [T. 418].

The ALJ asked the Plaintiff if she received any help, in addition to her twice weekly housekeeper, and the Plaintiff replied that she got help from friends and family when they came over.  Id.  The Plaintiff testified that she cooked frozen meals, but did not do any other cooking.  Id.

The Plaintiff's attorney then asked the Plaintiff about her work history.  [T. 419].  The Plaintiff stated that she started working at U.S. Bank in 1996, and became unable to work full time in February of 2002.  Id.  She added that she applied for and received short-term disability benefits, and eventually applied for and received long-term disability benefits.  Id.  The Plaintiff's attorney asked the Plaintiff if she was still receiving long-term disability benefits, and the Plaintiff testified that she was sent for an evaluation by a physician in the Fall of 2003, and a month later she received a letter denying her further long-term disability benefits.  [T. 419-20].  The ALJ asked the Plaintiff's attorney if that letter was in the Record, and the Plaintiff's attorney replied that the adverse medical examination had been performed at the request of the insurance carrier, the Hartford, and that due to ongoing litigation the insurance carrier

would not release any records.  [T. 420].  The ALJ then stated that she would have the Plaintiff sign a medical release form after the Hearing, and would order the records from the insurance carrier.  Id.

The Plaintiff's attorney then resumed questioning the Plaintiff, and asked her to recount her medical history. [T. 421].  The Plaintiff testified that, after she had stopped working at U.S. Bank, she was seen at the Minneapolis Clinic of Neurology, but that the physicians there were not able to provide any relief for her pain.  Id.  The Plaintiff added that she was also seen by Dr. Tarrel, who was able to provide her with some relief, but not enough to enable her to return to work.  [T. 421-22].  The Plaintiff's attorney asked the Plaintiff what her current physician, Dr. Zuckman, told her about her condition, and she replied that he had not actually discussed a diagnosis, but in February or March of 2004, he had stated that she had some permanent injury or damage.  [T. 422].  The Plaintiff added that, since she began seeing Dr. Zuckman, she had not undergone any additional x-rays, but did undergo an EMG on her right arm, that showed no abnormalities.  Id.

The Plaintiff's attorney then asked her about her use of a crutch.  Id.  The Plaintiff confirmed that this had been prescribed to her by Dr. Zuckman, because she needed help with balance, and to ease spinal pain when standing.  [T. 423].  The

Plaintiff's attorney asked the Plaintiff if she had been referred to any other doctors by Dr. Zuckman, and she replied that she had not been referred to a pain clinic, although she had been seen at the MAPS clinic. Id. In response to her attorney's question, the Plaintiff also stated that she was not being seen by a mental health professional, and that Dr. Zuckman had not discussed that option with her. [T. 424].

The Plaintiff's attorney then asked the Plaintiff if there was anything else that she wanted to add to the Record. Id. She replied that she did not want to give up working, and had struggled through barely being able to feed herself because of loss of function and pain. Id. The Plaintiff added that her condition varied, and that she had experienced a few months in the Summer of 2004, during which she had been forced by her pain to crawl from room to room. Id.

The ALJ then asked the Medical Examiner ("ME") if he had any questions for the Plaintiff, and the ME said that he did not. [T. 425]. The ALJ next asked the Vocational Expert ("VE") if he had any questions to pose to the Plaintiff, and the VE began by asking the Plaintiff if her job as an internal auditor at U.S. Bank had required sitting throughout the work day. Id. The Plaintiff replied that, when her injury had developed in 2001, she spent most of her day performing desk work and sitting, but that, when she transitioned into the position of internal auditor, she did more traveling.

Id.  The Plaintiff added that, when she had worked at a desk at U.S. Bank, she had sat

for most of an eight (8) hour day, and regularly lifted ten (10) pounds.  Id.

The ALJ then asked the Plaintiff's attorney if he stipulated to the qualifications

of the experts, and counsel responded that he did.  [T. 426].  The ALJ resumed his

previous examination of the Plaintiff, asking her about a pending lawsuit that related

to the injury she claimed to have suffered at work.  Id.  The Plaintiff admitted that she

had a lawsuit pending for a "work comp" claim, and added that she believed that her

lawyer in that case had also filed on her behalf for long term disability.  Id.

The ALJ began her examination of the ME by asking him what impairments he

found in the Plaintiff.  Id.  The ME testified that he found that the Plaintiff was

impaired by chronic neck and back pain, due to myofascial pain syndrome, but that

those impairments did not meet or equal the Listings.  [T. 427].  The ALJ next asked

the ME what restriction or limitation he would place on the Plaintiff's ability to work,

and the ME replied that he would place a sedentary level of exertion with the

additional allowance of changing posture every fifteen (15) minutes out of every hour.

Id.  The ME added that he would stipulate to no excessive hot or cold, or humidity,

and no overhead work or reach, with only occasional bending.  Id.  The ALJ then

asked the ME to comment on an exhibit, which was submitted at the Hearing, and

which was a request for a medical opinion signed by Dr. Zuckman in May of 2004. Id. The ME noted that he agreed with the assessment's bar on overhead work, but did not see support in the Record for the limit to two (2) hours of work per day. Id.

The Plaintiff's attorney then asked the ME about objective abnormalities documented in the Record -- specifically an MRI of the Plaintiff's cervical spine that showed some degenerative changes, and notes suggesting that the Plaintiff's physicians had found muscle spasm and tightness. [T. 428]. The ME admitted that there were some records that suggested that the Plaintiff experienced muscular spasm or tightness, but that those were somewhat minimal objective findings. Id. The ME agreed with the statement of the Plaintiff's attorney, that the Plaintiff's pain complaints were far in excess of what he would expect, given the objective medical findings. Id. The Plaintiff's attorney then asked the ME if he felt that a Consultative Examination ("CE") would help him to better understand how the Plaintiff's impairments affected her ability to work, and the ME replied that a CE might help. Id. The Plaintiff's attorney then clarified that he was referring to a psychological examination, and the ME replied that he did not know how helpful such an examination would be for him, as he was neither a psychologist nor a psychiatrist. [T.

429].   The ALJ intervened, and noted that an exhibit had been submitted at the Hearing from a neuropsychologist.  Id.

The ALJ then swore the VE to testify, and the ALJ asked if the Hearing testimony had changed his opinion.  Id.  The VE testified that, based on the testimony, he would classify the Plaintiff's position as an internal auditor at U.S. Bank as a sedentary position.  Id.  The ALJ then posed a hypothetical to the VE.  Id.  The ALJ asked the VE to assume an individual who was thirty (30) years old at onset, with a college education, work experience as outlined and modified by the VE, who was on a number of medications with no side effects, and was impaired with chronic neck and back pain characterized as myofascial in origin.  Id.  The ALJ added that the individual also suffered from headaches and numbness of her right arm, was limited to lifting and carrying ten (10) pounds occasionally, and five (5) pounds frequently, and could perform work that required no power gripping, twisting, or pounding on the dominant side.  [T. 429-30].  The hypothetical individual would have to be allowed to change posture every fifteen (15) minutes, and be allowed the use of a crutch, with occasional bending, stooping, twisting or climbing, no crawling or crouching, and no work that required repetitive rotation, fixation, or flexation of the neck, no over-the-

- 21 -

shoulder work, no exposure to temperature or humidity extremes, and no heights, ladders, or scaffolds.  [T. 430].

The ALJ asked the VE if the hypothetical individual could perform any of the Plaintiff's previous work.  Id.  The VE testified that the individual could perform such work, since the auditor or accounting clerk position would satisfy the ALJ's hypothetical, and there were 40,000 such positions in the State economy.  Id.  The ALJ asked the VE how many of those positions would fit the restrictions that she had imposed, and the VE testified that approximately 10,000 positions would be available. Id.  The ALJ then asked the VE if any other work would be available to the hypothetical individual, and he testified that work would also be available as an information clerk, which is a sedentary, low-level, semi-skilled position, of which there were 3,000 such positions available in the State economy. [T. 430-31].  The VE added that a receptionist position was also available to the individual, which is sedentary, lower-level, and semi-skilled, with 5,000 to 7,000 positions available in the State economy, as well as a position as a security monitor, which is sedentary, unskilled work, and had 3,000 positions available.  [T. 431].

The ALJ then asked the VE how it would change the job numbers the VE had cited, if she added the further restriction that the hypothetical individual could not

perform any repetitive arm, hand, or shoulder use, and that, due to the effects of pain, nothing more than low level, semi-skilled work would be appropriate. Id. The VE replied that, with that addition, he would eliminate the auditor/accounting clerk position, but would continue to find 3,000 positions as an information clerk, 3,000 positions as a security monitor, and approximately 2,500 to 3,000 positions available as a receptionist. Id. The ALJ concluded by asking the VE if there were any other discrepancies between his testimony, and the job descriptions in the DOT, other than as to the auditor/clerk position, and the VE replied that there were not. Id.

The Plaintiff's attorney then asked the VE about the ALJ's limitation regarding posture change every fifteen (15) minutes, and asked if it would eliminate competitive employment if the individual needed to stand and move away from the work station, such as might interrupt her ongoing job function. [T. 432]. The VE responded that competitive employment would be precluded if a person needed to leave her work station, and not perform the essential functions of her job, for several minutes at a time. Id.

The ALJ closed by asking the Plaintiff if she had anything further to add to the Record, and the Plaintiff stated that she did not. Id. The ALJ noted that she would have the Plaintiff sign medical release forms, that the Plaintiff's attorney would

provide the number of the Plaintiff's worker compensation attorney, and that she

would order additional records.  Id.  In concluding, the ALJ added that she would

provide any additional records to the Plaintiff's attorney for review, would allow a

short period for comment, and would then make a decision based on the Record.  Id.

      C.    The ALJ's Decision.  The ALJ issued her decision on April 19, 2005.  [T.

19-32].   As she was required to do, the ALJ applied the sequential, five-step

analytical process that is prescribed by 20 C.F.R. §§404.1520.[4]  The ALJ noted that

---

[4]Under the five-step sequential process, the ALJ analyzes the evidence as
follows:

> (1) whether the claimant is presently engaged in a
> "substantial gainful activity;" (2) whether the claimant has
> a severe impairment that significantly limits the claimant's
> physical or mental ability to perform basic work activities;
> (3) whether the claimant has an impairment that meets or
> equals a presumptively disabling impairment listed in the
> regulations; (4) whether the claimant has the residual
> functional capacity to perform his or her past relevant
> work; and (5) if the claimant cannot perform the past work,
> the burden then shifts to the Commissioner to prove that
> there are other jobs in the national economy that the
> claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has
an impairment that limits his ability to perform basic work activities; and his
impairment is either presumptively disabling, or he does not have the residual
functional capacity to perform his previous work, and he cannot perform other work

the Plaintiff was insured for DIB through December 31, 2008. [T. 19]. As a threshold matter, the ALJ considered whether the Plaintiff had engaged in substantial gainful activity at any time since her alleged onset date of disability -- February 4, 2002.[5] [T. 20]. The ALJ noted that the Record and Hearing testimony revealed that the Plaintiff worked sporadically from February of 2002, until September of 2002, although for much of that time she was on sick leave, and spent several weeks off work placement, or on short-term disability benefits. Id.

Specifically, the ALJ noted that in February of 2002, the Plaintiff took a number of half days off work, and from March of 2002, through April of 2002, she worked only four (4) hours a day, five (5) days a week. Id. The Plaintiff was placed off work for three (3) weeks in May of 2002, and from June of 2002, through September of 2002, she worked only one (1) to two (2) hours a day, five (5) days a week. Id. The ALJ noted that the Plaintiff related that, during that period, her wages were supplemented by short-term disability benefits. Id. On September 23, 2003, the

---

existing in the national economy. Id. at 754.

[5]In the ALJ's decision, the ALJ initially incorrectly refers to the Plaintiff's alleged date of onset as February 4, 2003, [T. 19], but we consider that as no more than a typographical error, for at all other times at the Hearing, and in her decision, the ALJ refers to the correct alleged onset date of February 4, 2002.

Plaintiff began receiving long-term disability benefits. Id. According to the Plaintiff, after her long-term disability benefits were terminated, she started back at work on May 21, 2003, working for two (2) hours a day, five (5) days a week, for $16.12 an hour. Id. The Plaintiff reported that she was terminated from her employment in March of 2004, because of her inability to increase her work hours. Id. The ALJ concluded that the Record did not clearly show that the Plaintiff's continued work activity resulted in consistent substantial gainful earnings, and noted that she gave the Plaintiff the benefit of the doubt with respect to her work capacity. Id. However, the ALJ added that the Plaintiff was capable of some work activities, contrary to her allegations of total disability and incapacitating limitations. Id.

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise her ability to engage in work activity. Id. After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely disabled by cervical pain/strain associated with tension headaches and chronic low back pain of a myofascial type, deconditioning, and chronic pain syndrome. Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations. See, 20 C.F.R. §§404.1520(d). The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based on the testimony of the ME, and the Record as a whole. Id.

Specifically, the ALJ considered the testimony of the ME, who noted that the Record reflected evaluations and treatments for chronic neck and back pain, but also opined that the Plaintiff was capable of sedentary exertional work, with the ability to change postures, no requirements for working overhead, no exposure to excessive heat or cold temperatures, and performing no more than occasional bending. Id. After reviewing the medical records, which were submitted to the ALJ after the Hearing, the ME concluded that the Plaintiff would not be able to work overhead, but found no support for limiting the Plaintiff to only two (2) hours of work a day. Id. In response to the Plaintiff's claims, at the Hearing, of muscle spasms and tightness, and changes noted on her MRI exam, the ME felt that the Plaintiff's pain complaints went further than the records would indicate. [T. 21]. The ALJ concluded that the ME had conducted a thorough and complete assessment of the Plaintiff's condition, had carefully reviewed the Record, and that the ME's opinion was consistent with the

weight of the existing medical record.  Id.  Consequently, the ALJ placed significant

weight on the ME's opinion, and found that the Plaintiff's impairments did not meet

or equal a Listings level of severity.  Id.

The ALJ then proceeded to determine whether the Plaintiff retained the

"residual functional capacity" ("RFC") to engage in the duties required by her past

relevant work, or whether she was capable of engaging in other work which existed

in significant numbers in the national economy.  Id.  RFC is defined in the Regulations

as the most an individual can still do after considering the effects of physical

limitations that can affect the ability to perform work-related tasks.  See, 20 C.F.R.

§404.1545, and Social Security Ruling 96-8p.  The ALJ recognized that, in order to

arrive at the Plaintiff's RFC, she was obligated to consider all of the symptoms,

including the Plaintiff's subjective complaints of pain, and that those complaints were

to be evaluated under the standard enunciated in Polaski v. Heckler, 739 F.2d 1320

(8th Cir. 1984), Social Security Ruling 96-7p, and 20 C.F.R. §404.1529.

In determining the Plaintiff's RFC, the ALJ first considered the Plaintiff's claim

that she had been unable to perform any work activity since February 4, 2002, because

of an injury resulting in neck and low spinal pain.  Id.  At the Hearing, the Plaintiff

testified that she was unable to lift more than two (2) to five (5) pounds, stand for

longer than thirty (30) minutes, or sit for more than ten (10) to fifteen (15) minutes. Id. The Plaintiff also alleged that she found it difficult to use her right arm and hand, and had problems opening frozen meals. Id. The ALJ noted that the Plaintiff stated that she was prescribed a wheelchair, and a crutch, to help with her balance two (2) years prior to the Hearing, and that she used a crutch at home. Id. Further, the Plaintiff claimed that her pain was so severe, during the Summer of 2004, that she was forced to crawl around her room. Id. However, the ALJ also noted that the Plaintiff admitted that she had not been to the pain clinic since 2003, and that the EMG results of her right arm were inconclusive. Id.

The ALJ found that the Plaintiff's limitations resulted primarily from subjective complaints, and arrived at the following RFC:

> [The Plaintiff] has retained the residual functional capacity for a range of sedentary exertional work not requiring lifting and/or carrying weight of more than 10-5 pounds at a time, with the ability to change positions after every 15 minutes, no more than occasional bending, stooping, or twisting, no power gripping or twisting, no crawling and no working over the shoulders, at heights or on ladders, no repetitive rotation of the neck or exposure to temperature extremes, and, which would accommodate for the use of a crutch.

Id.

The ALJ concluded that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that she had been disabled, by her physical impairments, from all work activity since February 4, 2002.  Id.

In reaching the Plaintiff's RFC, the ALJ noted that she accorded the Plaintiff all reasonable doubt, including giving consideration to her pain and symptom complaints, the opinions and RFC assessments of her treating physicians, the opinions and RFC assessments of the State Agency consulting physicians, and other organizations' evaluation of her functional capacity.  [T. 22].  The ALJ noted that she had also considered the Plaintiff's request for a psychological examination with regard to depression, pursuant to Social Security Regulation 96-7p.  Id.  The ALJ declined the Plaintiff's request to order a Consultative Evaluation ("CE"), because she found nothing in the medical records to support or substantiate the request, and noted that, in fact, the Plaintiff asserted that she was not disabled because of a mental impairment, and candidly admitted that she had not had any mental health treatment.  Id.  Additionally, the ME did not mention or note any evaluation or treatment relating to mental health problems.  Id.  The ALJ conceded that the Plaintiff's treating physician, Dr. Zuckman, suggested that the Plaintiff's condition was affected by a psychological

condition, but noted that he had not referred the Plaintiff for psychological evaluation or testing, nor tried to treat the Plaintiff himself.  <u>Id.</u>

The ALJ further observed that the Plaintiff had been prescribed antidepressant medications, but that those were for treatment of her chronic pain condition, rather than a mental condition.  <u>Id.</u>  The Record showed that a neuropsychological evaluation of the Plaintiff on April 29, 2003, revealed that her performance on a wide range of neuropsychological measures was essentially within the average range.  <u>Id.</u>  Dr. Lamberty, the evaluating psychologist, stated that the Plaintiff had no need for any further psychological or neuropsychological testing, and noted that the Plaintiff's difficulties were not the primary obstacle to the Plaintiff's resumption of any employment.  <u>Id.</u>  The ALJ concluded that there was "little, if any, evidence in the record supporting [the Plaintiff's] counsel's request for a psychological evaluation relating to depression," and accordingly, denied the Plaintiff's request for a CE.  <u>Id.</u>  As a result, the ALJ stated that she could not find the Plaintiff credible with respect to her testimony that she was incapable of performing any work sufficient to engage in substantial gainful activity, because of significant inconsistencies in the Record as a whole.  <u>Id.</u>

The ALJ found that the Plaintiff's allegations of disabling pain and incapacitating limitations were not consistent with, or supported by, the objective medical record, or by records submitted by the Plaintiff's treating and examining physicians. Id. The Record revealed that, on March 27, 2002, Dr. See evaluated the Plaintiff for pain at the back of her head and neck, which had been somewhat helped by chiropractic treatment. Id. Dr. See also recorded that the Plaintiff had been having low back pain since her chiropractic spinal adjustments, but denied having shooting pain in her upper extremities, or numbness or weakness in her upper or lower extremities. Id. Dr. See noted no previous hospitalizations, surgeries, or history of injuries in the Plaintiff's history, and found the Plaintiff to have normal tone and strength in her upper and lower extremities, normal reaction to pinprick sensation, deep tendon reflexes were normal and equal, with no ankle clonus, Babinskis down going, normal station and gait, and negative Romberg. Id. Dr. See determined that the Plaintiff could walk on heels, toes, and in tandem, and had mild limitation and range of motion of the neck with extension, and mild tenderness and spasm of the trapezius muscles and cervical musculature. [T. 23]. The ALJ recorded that Dr. See diagnosed the Plaintiff with headache and neck pain, prescribed Naprosyn and

recommended Flexeril, and expressed his intent to obtain an MRI of the brain and cervical spine for further management of the Plaintiff's pain.  Id.

The ALJ reviewed the further treatment notes of Dr. See from April of 2002, in which he recorded that the results of the Plaintiff's brain MRI were negative, and that her cervical spine MRI evidenced only degenerative facet changes at C4-5 and C5-6, with fluid in the facet synovium and no appreciable canal or foraminal compromise throughout.  Id.  Although he reported those negative test results to the Plaintiff, she continued to have neck pain and headaches, and consequently, Dr. See referred the Plaintiff to physical therapy in order to develop an exercise program, and advised her to follow up with her primary care physician.  Id.

The ALJ also considered evidence from the Plaintiff's visit to the Emergency Room on May 15, 2002, when she was seen by Dr. Paul Lund for acute exacerbation of chronic neck pain.  Id.  The Plaintiff had an MRI of her neck, which showed mild facet inflammation but no definite disk herniation, nerve entrapment, or other significant problems.  Id.  Dr. Lund's report noted that the Plaintiff had been treated

- 33 -

by a variety of medications, including Naproxen,[6] Amitriptyline,[7] Cyclobenzaprine,[8] and Tylenol with codeine, but that, at the time of her visit, she was only taking Tylenol with codeine, and Ambien.  Id.  At the Emergency Room, the Plaintiff denied any recent trauma, but admitted that she had experienced worsening pain after undergoing physical therapy the previous day.  Id.

On examination, Dr. Lund found that the Plaintiff had mild tenderness over the occipital scalp, but no point tenderness directly over the occipital nerves, and was diffusely tender over the cervical and upper thoracic paraspinal muscles and trapezii, with no muscle spasms, and a good range of motion in her neck.  Id.  The physician found that the Plaintiff's muscle strength was 5/5 in all muscle groups of the upper extremities, with normal distal sensation and good peripheral pulses.  Id.  Dr. Lund discharged the Plaintiff with a diagnosis of acute exacerbation of chronic neck pain,

---

[6]Naproxen is a generic name for Naprosyn.  Physician's Desk Reference, p. 2769 (60th ed. 2006).

[7]Amitriptyline is "a tricyclic antidepressant * * * also having sedative effects * * * used in the treatment of enuresis, chronic pain, peptic ulcer, and bulimia." Dorland's Illustrated Medical Dictionary, p. 63 (29th ed. 2000).

[8]Cyclobenzaprine is a generic name for Flexeril.  Physician's Desk Reference, p. 1832 (60th ed. 2006).

having administered Demerol,[9] Vistaril IM,[10] and Toradol IM,[11] which improved the

Plaintiff's discomfort.  Id.

The Record contained notes from the Plaintiff's visit to Dr. Tarrel in May of

2002, which was undertaken at the request of the Plaintiff's chiropractor.  Id.  Dr.

Tarrel assessed the Plaintiff with status-pose Gillette type work related injury, with

cervical sprain, associated headaches and mid- and low-back pain, and extremity

paresthesias.  Id.  According to the Record, Dr. Tarrel found that the nature of the

Plaintiff's symptoms could not be related to a nerve pinch or other neurologic

abnormalities, he recommended continued physical therapy, and light duty working

---

[9]Demerol is a trademark for a preparation of meperidine hydrochloride, that is "used as a preanesthetic medication and obstetric analgesic, and when a relatively short duration of analgesia is desired." Dorland's Illustrated Medical Dictionary, pp. 417, 1087 (29th Ed. 2000).

[10]Vistaril is a trademark for preparations of hydroxyzine, which is "a synthetic drug with central nervous system depressant, antispasmodic, antihistaminic, and antifibrillatory actions. Dorland's Illustrated Medical Dictionary, pp. 846, 1973 (29th Ed. 2000).

[11]Toradol is a trademark for preparations of ketorolac tromethamine, which is "a nonsteroidal anti-inflammatory agent used for short-term management of pain." Dorland's Illustrated Medical Dictionary, pp. 942, 1853 (29th Ed. 2000).

restrictions for two (2) hours a day for the next three (3) weeks.  Id.  Dr. Tarrel gave

the Plaintiff a prescription for Celexa.[12]  Id.

As considered by the ALJ, the Plaintiff presented at the Emergency Room on

May 19, 2002, with a complaint of headache, and was seen by Dr. Daniel Olaughlin,

who found the source of the Plaintiff's symptoms had previously been determined to

be caused by a muscle strain to the neck.  [T. 23-24].  The Plaintiff claimed that her

current pain was different, and that her vision was "weird," and she was nauseated.

[T. 24].  The Plaintiff reported that she had been seen by multiple medical physicians

and chiropractors for her pain, and that her MRI, in March of 2002, did not reveal any

significant cause for her pain.  Id.  Dr. Olaughlin examined the Plaintiff, found no

trigger point areas, although he noted some trapezius tenderness to palpitation along

both sides, as well as a decreased range of motion to the neck secondary to pain, but

noted that the Plaintiff moved around fairly well and had no gross acute deformities

or focal neurological deficits.  Id.  Dr. Olaughlin saw no acute significant cause for the

Plaintiff's pain, or trigger points that would require injection, and found that her

examination was consistent with a cervical muscle strain, with a possible atypical

---

[12]Celexa is "an orally administered selective serotonin reuptake inhibitor (SSRI)," that is "indicated for the treatment of depression."  Physician's Desk Reference, pp. 1177-78 (60th ed. 2006).

migraine.  Id.  The Plaintiff was discharged with the recommendation that she consult just one physician who could focus on the matter, and was prescribed Ultracet[13] for pain control.  Id.

The ALJ also considered records that showed that the Plaintiff was evaluated for exacerbation of headaches and neck pain in May of 2002, and given a trial of several medications, which resulted in her report, in June of 2002, that her symptoms had significantly improved, and her pain levels had dropped.  Id.

Dr. Usmanova consulted with the Plaintiff for neck pain, arm weakness with tingling, headaches, nausea, and dizziness, which the Plaintiff attributed to a work-related injury from December of 2000, that became serious in February of 2002.  Id. The Record reveals that the Plaintiff was working two (2) hours a day, three (3) days a week, had been treated with physical therapy and various medications.  Id.  Dr. Usmanova found no neurological abnormalities in her examination of the Plaintiff, and no evidence of pinched nerve or other problems, and offered to perform an EMG exam, which the Plaintiff declined.  Id.   At the close of the examination, Dr.

---

[13]Ultracet "is indicated for short-term (five days or less) management of acute pain."  Physician's Desk Reference, p. 2463 (60th ed. 2006).

Usmanova recommended continued physical therapy, and prescribed Skelaxin[14] for sore muscles, while recommending that the Plaintiff establish care with a primary care physician, because Dr. Usmanova found no need for further neurological intervention. Id.

Dr. Tarrel's notes from August of 2002, stated that the Plaintiff had been slowly getting better, and continued to work no more than two (2) hours a day, for six (6) hours a week, under light duty restrictions. Id. Dr. Tarrel gave the Plaintiff a prescription for Soma,[15] and encouraged her to begin Pilates therapy -- a type of physical and mental conditioning. Id.

The ALJ also considered records from a consultation with Medical Pain Clinics ("MAPS") on September 24, 2002, that resulted in a diagnosis of cervicalgia, possibly facet mediated, as there was facet joint degree degeneration on cervical MRI, and lumbar back pain, with a normal lumbar MRI, myofascial in origin. Id. In addition,

---

[14]Skelaxin is a trademark for a preparation of metaxalone, that is "a smooth muscle relaxant used in the treatment of painful muscoskeletal conditions." Dorland's Illustrated Medical Dictionary, at pp. 1097, 1651 (29th Ed. 2000).

[15]Soma is a trademark for preparations of carisoprodol, which is "a centrally acting central muscle relaxant, for the systematic management of acute, painful musculoskeletal disorders." Dorland's Illustrated Medical Dictionary, at pp. 289, 1663 (29th Ed. 2000).

physical therapy discharge notes from November 15, 2002, revealed that the Plaintiff had been seen for a total of thirty-three (33) visits, and had exhibited a full range of motion of her neck and back, with no neurological deficits, but less than functional strength.   [T. 25].   The summary disclosed that the Plaintiff's residual dural restrictions were so minimal that they precluded the severity of her symptoms, and the Plaintiff was dismissed from physical therapy for lack of sufficient gains. Id. The ALJ noted that, a few months later, Dr. Tarrel wrote that the Plaintiff had been treated through MAPS, and was taking Neurontin,[16] which he hoped to increase, and that he had arranged for the Plaintiff to remain off work through December of 2002.  Id.

In January of 2003, Dr. Tarrel noted that the Plaintiff was in the midst of a chronic pain syndrome, and had been thoroughly evaluated and treated at MAPS.  Id. According to his notes, Dr. Tarrel told the Plaintiff that he had nothing left to offer her from a strictly physical standpoint, as she presented no evidence of any kind of neurological illness, but needed "to take the information she had learned and simply go with it."  Id.  Later in January of 2003, the Plaintiff established primary care with Dr. Zuckman, who diagnosed the Plaintiff with chronic myofascial pain, probable

---

[16]Neurontin is a trademark for a preparation of gabapentin, which is "used as adjunctive therapy in the treatment of partial seizures." Dorland's Illustrated Medical Dictionary, at pp. 721, 1212 (29th Ed. 2000).

fibromyalgia, and craniocervical, chest wall, thoracic, and lumbosacal somatic dysfunction. Id. Dr. Zuckman continued the Plaintiff on chiropractic manipulations, acupuncture therapy, warm water pool therapy, and oral medications. Id.

The ALJ included in her assessment the notes from Dr. Lamberty's neuropathological examination of the Plaintiff, which was performed at the request of Dr. Tarrel. Id. Dr. Lamberty found that the Plaintiff's performance on a wide range of neuropsychological measures was essentially average, and he did not perceive any indication of a fundamental brain-related dysfunction that would account for the Plaintiff's symptoms. Id. According to Dr. Lamberty, the Plaintiff acknowledged that her cognitive standpoint had improved in the past several months, and Dr. Lamberty opined that the Plaintiff's cognitive difficulties probably corresponded to her level of pain and difficulty with other symptoms. Id. Dr. Lamberty concluded that the Plaintiff had no need for any further psychological or neurological assessments, and that the Plaintiff's difficulties were not a primary obstacle in resuming any kind of employment. Id.

The ALJ continued her review of the medical records by considering follow-up progress notes by Dr. Zuckman for waxing and waning neck, back, shoulder, and arm pain, which were treated by chiropractic manipulations, physical therapy and home

exercises, counterstrain techniques and craniosacral/myofascial release techniques, as well as Alpha-stimulation trials, steroids, and medications.  Id.  In July of 2003, the Plaintiff was seen by Dr. Apte-Kakade, who found no contraindication to MedX spinal functional testing.  Id.  Discharge notes from September of 2003 revealed that the Plaintiff was given a diagnosis of work-related myofascial injury, chronic neck, shoulder, and back pain, and overall deconditioning, and completed twenty-four (24) prescribed MedX rehabilitation visits, with modest improvement resulting from the program.  [T. 25-26].

Finally, in February of 2004, the Plaintiff underwent a physical work performance evaluation, and was found capable of sustaining the sedentary level of work for an eight (8) hour day.  [T. 26].  The evaluator found that the Plaintiff showed no signs of discomfort during her interview, or manual testing, and recorded her muscle strength as well within functional limits, with a normal range of motion, and ease in moving between positions.  Id.  However, the evaluator recorded that the Plaintiff's difficulties appeared to be magnified when she was involved in direct testing situations, by slowing her pace and grimacing, and further noted that the Plaintiff appeared to be self-limiting on approximately 44% of the tasks.  Id.  The evaluator concluded that the tasks performed might be what the Plaintiff was willing

to do, rather than representing a safe maximum physical effort, and recorded that the Plaintiff had failed three (3) or more of the validity criteria of the XRTS Fland Strength Assessment, which suggested a strong likelihood that the Plaintiff was not complying with the test, and that the results were invalid.  Id.  The evaluator concluded that the Plaintiff could continue to work in her position as a quality control servicing staff auditor with U.S. Bank because, based on the physical job requirements provided by the Plaintiff, as well as the written job description, she matched all of the physical requisites without restrictions.  Id.  In September of 2004, the Plaintiff had an EMG examination of her right arm, that was normal.  Id.

The ALJ considered all of the evidence that she had reviewed in the Record, and found that the Record failed to document any impairment that could be expected to result in the severe, unremitting pain alleged by the Plaintiff, while the absence of evidence of significant cord compression, or ongoing neurological abnormalities, was not consistent with the Plaintiff's allegations of disabling levels of pain.  Id.  Specifically, the ALJ noted that there was minimal information in the Record regarding problems with the Plaintiff's arm, hand, or balance.  Id.  The Plaintiff had testified that she had trouble opening frozen meals, and had been prescribed a wheelchair and a crutch to help with balance, but the ALJ noted that, except for

sporadic evaluations, there was no evidence that the Plaintiff had sought, required, or received, any continuous medical treatment for any of her allegedly disabling conditions, and no evidence was presented that the conditions required surgery, hospitalizations, or therapy, because of complications or exacerbation.  Id.  The ALJ found that there was little documentation for any treatment of the Plaintiff's conditions, and no indication that the Plaintiff had any sustained difficulty with gross or fine manipulations, or gait.  Id.  A physical work performance evaluation, which was performed in February of 2004, determined that the Plaintiff's muscular strength was well within functional limits, and her range of motion was considered normal, while an EMG of her right arm was also normal.  Id.

The ALJ added that she considered Dr. Tarrel's RFC from May of 2002, and Dr. Zuckman's disability opinion in April of 2003, as well as his RFC in April and May of 2004.  [T. 27].  The ALJ declined to give significant weight to the opinions of either physician, because they were conclusory and not fully substantiated by objective findings, imaging studies, and extensive and thorough workups, and were also inconsistent with the conservative course of treatment provided to the Plaintiff. Id.  The ALJ noted that Dr. Tarrel's opinion was generated after examinations that were essentially negative, and she cited his statement, in May of 2002, that the

Plaintiff's trapezius muscles were 5/5, as was her strength in all extremities, that she had no drift or tremor, normal gait strength, and that her motor examination showed normal bulk and tone throughout. Id. Dr. Tarrel found that the Plaintiff's cerebellar exam revealed intact finger-to-nose and heel-to-shin abilities, and normal deep tendon reflexes. Id. A re-evaluation, in August of 2002, found that the Plaintiff's trapezius muscles were 5/5, revealed no evidence of cranial nerve dysfunction, documented good power and normal movement in all extremities with normal bulk and tone, and no incoordination. Id.

The ALJ noted that Drs. Tarrel and Zuckman's opinions were generated to assist the Plaintiff in obtaining disability benefits through her former employer, U.S. Bank, workers' compensation benefits relating to her myofascial work-related injury, and state economic assistance -- programs which utilized different criteria for determining disability than those used by the State Agency. Id. The ALJ further noted that Drs. Tarrel and Zuckman's opinions were inconsistent with recent objective findings, which showed that the Plaintiff was capable of sustaining eight (8) hours of work a day at a sedentary level. Id. Specifically, in February of 2004, the Plaintiff underwent a physical work performance evaluation, and was found to be capable of physical work at the sedentary exertional level, as defined by the United States

Department of Labor in the DOT.   The evaluating therapist concluded that the Plaintiff should continue to work in her position as a quality control servicing staff auditor with U.S. Bank, because "she matches all physical capabilities without modifications."   Id.   The ALJ further explained that, based on the inconsistencies between Drs. Tarrel and Zuckman's disability opinions and the evidence in the Record as a whole, she had considered their opinions in arriving at the Plaintiff's RFC, but did not give them significant weight.   Id.

Next, the ALJ considered the RFC assessment offered by Dr. Zilka in April of 2002.   Id.   The ALJ declined to give significant weight to Dr. Zilka's opinion because it was conclusory, and was not well-supported by the objective findings, imaging studies, or extensive and thorough work-ups.   Id.   In addition, recent medical records suggested that Dr. Zilka was no longer one of the Plaintiff's primary care providers, and the ALJ reasoned that his opinion was not an accurate depiction of the Plaintiff's functioning, since he was no longer knowledgeable about her conditions and symptoms, their progression and/or regression.   Id.   The ALJ added that Dr. Zilka's opinion, as a chiropractor, was not recognized as an opinion from an acceptable medical source, and so, while she considered his opinion in ascertaining the Plaintiff's RFC, she did not give it significant weight.   [T. 27-28].

- 45 -

As considered by the ALJ, the ME testified that the Plaintiff was capable of sedentary exertional work, with the ability to change postures, and with requirements of no overhead work, no exposure to excessive heat or cold, or performing more than occasional bending.  [T. 28].  The ME testified that he saw no support for limiting the Plaintiff to only two (2) hours of work a day, and found that the Plaintiff's pain complaints went further than he would have anticipated, based on the objective records.  Id.  The ALJ gave significant weight to the ME's testimony, because of his specialization, his familiarity with the weight of the Record, and because he had an opportunity to review the entire Record.  Id.

On May 16, 2003, the State Agency consulting physician determined that the Plaintiff was capable of a range of medium exertional work with no frequent overhead work based on her myofascial pain.  Id.  The ALJ found that evaluation to be consistent with the weight of the evidence available at that time, but not with medical records made available thereafter, or with the testimony obtained at the Hearing.  Id.  The Record revealed that the Plaintiff continued to seek and require treatment for her chronic neck pain, that was associated with tension headaches and low back pain, myofascial in origin, as well as chronic pain syndrome.  Id.  In addition to various oral medications, the Plaintiff required injection therapy, steroids, repeated physical

therapy sessions, a TENS unit, a pain management program, acupuncture therapy, ongoing chiropractic manipulations, a MedX rehabilitation program, and a multitude of other conservative measures to manage her pain and symptoms. Id. An evaluation of the Plaintiff, in February of 2004, found that she was capable of sustaining sedentary level work for an eight (8) hour day. Id. The ALJ consequently did not place significant weight on the State Agency determination, since it was provided without the benefit of the most recent medical evidence and testimony of Record. Id.

The ALJ concluded that the RFC for the Plaintiff was consistent with the evidence on the Record as a whole, and also with the Plaintiff's use of medications. Id. The ALJ noted that the Plaintiff continued to take a number of medications, and found no indication that the medications had been totally ineffective in controlling her symptoms, or that the Plaintiff had sought emergency room services on a consistent, ongoing basis. Id. In June of 2002, the Plaintiff reported that the medications that she was taking were beneficial and, in August of 2004, Dr. Zuckman wrote that the Plaintiff's pain medications appeared to be doing "pretty good." Id. At the Hearing, the Plaintiff admitted that she did not have many side effects from her medications, nor did she complain that her medications had been ineffective in controlling her symptoms. Id.

The ALJ also evaluated the course of the Plaintiff's medical treatment, and found it to be completely inconsistent with the Plaintiff's subjective complaints. [T. 29]. The Record revealed that the Plaintiff had been treated with conservative modalities, such as physical therapy, facet and steroid injections, pain management, a TENS unit, MedX rehabilitation, chiropractic manipulations, acupuncture, pool therapy, and oral medications. Id. The Plaintiff had not required surgery or other invasive procedures and, in May of 2002, Dr. Olaughlin noted that he did not see any significant cause for the Plaintiff's pain, such as disc compression, weakness, sensory changes, reflexes changes, asymmetry, or trigger points, and diagnosed her with cervical muscle strain. Id.

In July of 2002, Dr. Usmanova found no abnormalities in the Plaintiff's neurological examination, and recommended physical treatment. Id. Dr. Tarrel saw the Plaintiff in January of 2003, stated that the Plaintiff did not have any evidence of a neurological illness of any kind, and that from a strictly physical standpoint, he had nothing further to offer her. Id. In September of 2003, Dr. Apte-Kakade found that the Plaintiff had good straight leg raising in a seated position without any pain, and negative long tract signs. Id. The ALJ found no indication in the Record that the Plaintiff had to consistently seek or receive treatment for problems with her arm or

hand, or balance, or that the Plaintiff required surgery, hospitalizations, or therapy because of complications or exacerbations.  Id.

In considering the Plaintiff's work history, the ALJ noted that the Record revealed that the Plaintiff continued to work after February 4, 2002, which was inconsistent with her claim of total disability.  Id.  From March of 2002, though April of 2002, the Plaintiff worked four (4) hours a day, five (5) days a week, and from June of 2002, through September 20, 2002, she worked one (1) to two (2) hours a day, five (5) days a week.  Id.  The ALJ noted that, during that period, the Plaintiff's wages were supplemented by short-term disability benefits which, on September 23, 2002, became long-term disability benefits.  Id.  After those benefits were terminated, the Plaintiff resumed work on May 21, 2003, working for her former employer U.S. Bank for two (2) hours a day, five (5) days a week, until she was terminated in March of 2004.  Id.  At the Hearing, the Plaintiff testified that, in April of 2004, she contacted the Department of Vocational Rehabilitation, but had not heard anything from them. [T. 29-30].  The ALJ noted that the Plaintiff continued to pursue her claim for workers' compensation benefits, and found, based on the Record, that the Plaintiff was capable of work but lacked motivation, and consequently, her work history did not bolster her credibility with respect to her claim for disability.  [T. 30].

Finally, the ALJ considered the Plaintiff's activities of daily living, and found that they were not consistent with disabling pain and symptoms. Id. The Plaintiff testified that she lived alone, and every day performed exercises, ate, watched television, talked on the telephone, and went to appointments. Id. The Plaintiff testified that she tried to put dishes away, had a housekeeper who came twice weekly, that she found it hard to hold a book to read, and that she did not use her personal computer at home. Id. The ALJ noted that the Plaintiff visited friends, went to the mall, attended church two (2) to three (3) times a week, and attended Bible study. Id. The ALJ found no evidence that the Plaintiff could not take care of herself, manage her affairs and medical care, focus and concentrate on things, or get to places. Id. The Record showed that the Plaintiff had no social problems with her family and friends, and that she was able to perform a wide range of activities inconsistent with her allegations of incapacitating limitations. Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, that the Plaintiff would be able to perform her past relevant work, as well as other work existing in significant numbers in the national economy. [T. 30]. The ALJ noted that she had posed a hypothetical to the VE, asking him if an individual of the Plaintiff's age, education, and past work experience, with the same RFC as the

Plaintiff, would be able to perform the Plaintiff's past relevant work as an internal auditor, bank teller, kitchen helper, or cashier. Id. The VE testified that the individual would be able to perform the Plaintiff's past work as an internal auditor, as that work is performed in the national economy, in addition to other jobs existing in significant numbers, such as accounting clerk, information clerk, receptionist, or as a security monitor clerk. Id. The ALJ found the VE's testimony to be credible and persuasive, and accordingly, found that the Plaintiff was able to return to her past work as an internal auditor. Id. Consequently, the ALJ concluded that the Plaintiff did not meet the statutory criteria for a finding of disability at any time relevant to her period of claimed disability. Id.

Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled at any time since February 4, 2002. [T. 31].

## IV. Discussion

A. Standard of Review. The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole. See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002);

Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890

(8th Cir. 2001).   Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."   Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"   Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we

will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting <u>Holley v. Massanari</u>, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record <u>de novo</u>.   See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

Lastly, where, as here, the Plaintiff submits additional evidence to the Appeals Council for review, which was not considered by the ALJ, our task on review is not completed until we "determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1068 (8th Cir. 2000), quoting <u>Riley v. Shalala</u>, 18 F.3d 619, 622 (8th Cir. 1999); see also, <u>Flynn v. Chater</u>, 107 F.3d 617, 621 (8th Cir. 1997).   "Evaluating such evidence requires us to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing." <u>Jenkins v. Apfel</u>, 196 F.3d 922, 924 (8th Cir. 1999), citing <u>Riley v. Shalala</u>, supra at 622.

B.    <u>Legal Analysis</u>. In support of her Motion for Summary Judgment, the only issue raised by the Plaintiff is her assertion that the ALJ failed to develop the Record by ordering a CE, so as to determine if the Plaintiff suffered from a disabling mental impairment.  See, <u>Plaintiff's Memorandum</u>, <u>Docket No. 15</u>, at pp. 10-12.

1.    It is well-established that "[a] social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005), citing <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004); <u>Walz v. Barnhart</u>, 2004 WL 742042 at *4 (D. Minn., March 31, 2004) .  The duty of the ALJ is applicable, even where, as here, an individual is represented by legal counsel.  See, <u>Weber v. Barnhart</u>, 348 F.3d 723, 725 (8th Cir. 2003), citing <u>Boyd v. Sullivan</u>, 960 F.2d 733, 736 (8th Cir. 1992).  However, "'an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1051 (8th Cir. 1999), quoting <u>Naber v. Shalala</u>, 22 F.3d 186, 189 (8th Cir. 1994); <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1023 (8th Cir. 1994)("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.").  Thus, the right to a post-Hearing CE exists only

where a Plaintiff's medical sources cannot, or will not, provide sufficient medical evidence to allow a determination as to whether the Plaintiff is disabled.  See, <u>20 C.F.R. §§404.1517 and 416.917</u>.

2.   <u>Legal Analysis</u>.  The Plaintiff claims that the Record contains numerous references to the Plaintiff's "somatic" complaints, which should have led the ALJ to order an evaluation so as to determine if the Plaintiff was impaired by a somatoform disorder.[17]  The Plaintiff specifically notes that the ME testified that the Plaintiff's complaints exceeded those he would have anticipated, based upon the objective medical findings in the Record.  <u>Id.</u> at p. 10.  The Plaintiff also refers to the results of an independent psychological evaluation that was submitted to the Appeals Council, after the ALJ's decision, which, she claims, "revealed the existence of a psychological impairment" that adversely affected the Plaintiff's ability to engage in work activities.  <u>Id.</u> at p. 11.

We cannot agree with the Plaintiff's view that the ALJ erred by failing to order a CE so as to weigh the possibility that the Plaintiff suffered from a mental

---

[17]A somatoform disorder is a mental impairment which is characterized by symptoms that are suggestive of a physical disorder, but which are actually of a psychogenic origin, and which are not under voluntary control.  <u>Dorland's Illustrated Medical Dictionary</u>, p. 532 (29th Ed. 2000).

impairment.   In reaching her decision, the ALJ expressly considered whether the Plaintiff was subject to any severe physical or mental impairment, and found that she was impaired by headaches and low back pain, deconditioning, and chronic pain syndrome.   [T. 20].   Later in her decision, the ALJ considered the Plaintiff's subjective complaints, and noted that the Plaintiff had made a request for a CE with a psychologist, pursuant to Social Security Regulation 96-7p, which provides as follows:

> The [ALJ] must develop evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists, and the individual alleges pain or other symptoms, but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms.

The ALJ explained that she had declined the Plaintiff's request to order a CE for two (2) reasons.   [T. 22].

First, the ALJ found nothing in the Record to support, or substantiate, the Plaintiff's request for a psychological evaluation.   Prior to her Hearing before the ALJ, the Plaintiff had never contended that she was disabled due to a mental impairment, and she admitted, at the Hearing, that she had never sought mental health treatment.   While Dr. Zuckman did suggest, in his notations, that the Plaintiff's

condition was affected by a psychological condition, he did not recommend that she

seek mental health treatment.  Our Court of Appeals has recognized that the failure to

seek treatment may be considered to be inconsistent with a disability.  Cf., Camp v.

Barnhart, 186 Fed.Appx. 696, 696 (8th Cir. 2006), citing Shannon v. Chater, 54 F.3d

484, 486 (8th Cir. 1995); Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003), citing

Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996); Banks v. Massanari, 258 F.3d

820, 825-26 (8th Cir. 2001).  In  Khalil v. Barnhart, 58 Fed.Appx. 238, 239 (8th Cir.

2003), the Court found no error in an ALJ's refusal to order a CE, with a psychologist,

for a claimant who had first sought treatment for depression the month before his

Hearing, and first alleged that he was impaired by depression at the Hearing.  See also,

Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993); cf., Norfleet v. Massanari, 16

Fed.Appx. 535, 536 (8th Cir. 2001).

Second, the ALJ expressly noted that the Record did contain the results of a

psychological evaluation of the Plaintiff, which was performed by Dr. Lamberty in

April of 2003.  [T. 22].  According to his notations, Dr. Lamberty performed a number

of neuropsychological tests on the Plaintiff, and determined that her performance was

in the average range, and that she had no need for any further psychological or

neuropsychological testing.  Id.  Based on the lack of objective medical evidence in

the Record, that would support the Plaintiff's claim of a possible mental impairment, we conclude that the ALJ's denial of DIB was supported by substantial evidence in the Record as a whole.

While we find the ALJ's decision to be supported by substantial evidence, as we have previously noted, our analysis does not stop with an appraisal of the Record that had been submitted to the ALJ, for we have an obligation to assess whether the information that the Plaintiff submitted to the Appeals Council -- namely, Dr. Reitman's report dated March 19, 2005, that details his psychological evaluation of the Plaintiff, [T. 404-08] -- would have counseled a different decision, or warrants a remand.   Our review of Dr. Reitman's report does not provide support for the Plaintiff's assertion that she is disabled by a mental impairment.  We recognize, of course, that Dr. Reitman was of the view that the Plaintiff is "work resistant," but that would not have surprised the ALJ, who had previously concluded that the Plaintiff was not fully motivated to work.  The ALJ did not conclude that the Plaintiff was a malingerer; rather, the ALJ found that the Plaintiff had no psychological impairment that would preclude substantial gainful activity.

Notably, Dr. Reitman reached the same conclusion.  As related by Dr. Reitman:

> [The Plaintiff]'s cognitive test results showed no significant
> impairment for her ability to engage in competitive

> employment, particularly a job that would require good
> ability for memory, attention and concentration.
>
> *      *      *
>
> [The Plaintiff] is a woman that, from a cognitive
> perspective, is capable of competitive employment.

[T. 407].

The ALJ came to the very same conclusion.  Moreover, Dr. Reitman found that, on

the basis of his evaluation, "[d]iagnostically speaking, it is difficult to consider her

having an actual somatoform disorder since she does not meet the diagnostic criteria

for this disorder in regards to her onset and age."  Id.  To the extent that the Plaintiff

might have a "proclivity for conversion disorder," Dr. Reitman simply noted that

"[t]his, in fact, **may** be one of the reasons that she is resistant to work."  [T. 406].  In

all, Dr. Reitman determined that the Plaintiff's "profile was essentially within normal

limits and not indicative of significant, acute or long-term psychopathology."  Id.

The most that can be drawn from Dr. Reitman's report is that the Plaintiff is

resistant to work, and that she could benefit from counseling to encourage her return

to work.  As a consequence, Dr. Reitman's report does not alter the ALJ's core factual

findings, and would not cause the ALJ to alter her decision to deny the Plaintiff's

claim for DIB, as substantial evidence in the Record on the whole, inclusive of Dr.

Reitman's report, fails to demonstrate a mental impairment that precludes the Plaintiff

from engaging in substantial gainful activity.[18]  Accordingly, finding no error in the

Commissioner's final decision that would warrant a remand, we recommend that the

Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-

Motion be denied.

NOW, THEREFORE, It is –

---

[18]Since we have found that the ALJ did not err in declining to find that the Plaintiff suffered from a disabling mental impairment, or by failing to order a CE to explore the possibility that the Plaintiff was disabled by a psychological impairment, we find no merit to the Plaintiff's subsidiary contention, that the hypothetical posed to the VE was flawed, because it did not include any limitations imposed by the Plaintiff's alleged psychological impairment. See, Plaintiff's Memorandum, at p.12. Under the law of this Circuit, "[a] hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005),  quoting Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001), in turn citing Prosch v. Apfel, 201 F.3d 1010, 1015 (8th Cir. 2000); see also, Grissom v. Barnhart, 416 F.3d 834, 837 (8th Cir. 2005); Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006).  Since the Record before the ALJ, and subsequently before the Appeals Council, demonstrate no mental impairment that precluded the Plaintiff from engaging in substantial gainful activity, the ALJ did not err in not including such a limitation in the hypothetical posed to the VE.

RECOMMENDED:

1.    That the Plaintiff's Motion [Docket No. 14] for Summary Judgment be denied.

2.    That the Defendant's Motion [Docket No. 18] for Summary Judgment be granted.

Dated: January 17, 2007                    s/Raymond L. Erickson
                                           Raymond L. Erickson
                                           CHIEF U.S.  MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **February 4, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **February 4, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.